Good morning. May it please the Court, Nadine Mercado appearing for the Petitioners, Roberto Miranda and family. Yes. Thank you. Your Honors, the central issue in this case is whether an interpreter may be held responsible for the subject matter of his interpretation or of the nature of the environment in which his interpretation takes place. Specifically, an interpreter who participates in legitimate governmental questioning by a sovereign nation of members of a terrorist organization, may he be found to have participated in interrogation. Mr. Miranda. This minute. The problem here, as I understand it, is whether or not the interrogation was legitimate, i.e., ask these people's questions, which we really don't know. We don't know that these people, the particular people he was interrogating, there was any reason to suspect. But even if it was, the problem was that it was not done, quote, legitimately. Right? In other words, you said it was legitimate interrogation. But that's the problem, is that it was apparently torturous interrogation. Well, the government of Peru believed that these were Shining Path operatives. Well, I understand that. But the interrogations occurred in connection with torture. There doesn't seem to be a dispute about that, right? At this stage, yes. Okay. Yes. Whether there was prior questioning, you know, prior to this, to, you know, them being brought into this room, I, we don't know. Okay. But at this stage, torture was used by the Peruvian government. I guess the question is, over a period of years, he participated in the interrogation, in the sense that he was the translator. Yes, that's correct. I guess there was some confusion as to whether he had himself participated in the torture. He claims that he had not. But one of the translations by the asylum officer seemed to think that he had. Yes, my client has repeatedly held that he did not participate in terms of actually inflicting any form of torture in any way, shape, or manner on any individual at any time in Peru. He did, has repeatedly held that he was merely an interpreter. And during interrogation, when he felt that someone could not answer a question properly due to methods used by the Peruvian government, he was told to, actually reprimanded, to be quiet, as he was simply an interpreter. Okay, but as I understand the principles here, voluntariness is not the standard or motive, right? Is that much correct? That's correct. So the real question is drawing a line between what kind of participation or assistance counts under the statute and what doesn't. I would agree. And so do you have some overall thesis or line or principle by which one would draw? We have almost no case law on this. I totally agree. Your Honor, it's my understanding that an interpreter is simply a voice box. You hear something in one language, you state it in the other language. But on the other hand, without the voice box, the whole thing could never have happened. It's an essential voice box. Not, I would disagree, Your Honor. Given the technology that exists today, you do not need an interpreter to be present in the environment in order to offer interpretation. I have been in proceedings many times where interpreter is available by phone. What if Mr. Miranda was available by phone? Is he, at that point, participating in interrogation? What if Mr. Miranda is available by intercom on a, in a, from a separate room in the same police bill or the same governmental building? Is he participating in an interrogation? What if Mr. Miranda simply viewed a videotape of the proceedings after and then interpreted what went on? Did he then, would he have then retroactively participated in the interpretation? Going one step further, what if he simply interpreted an audiotape of the proceedings? Would he then participated in the interrogation? The fact is that he was present. He was in the room. He observed the torture. That, that is correct. And you're essentially saying that one factor might, that, that essentialness might not be a good enough factor by itself. Yes. And that may be. But then we have this additional factor, which is he was physically present. Uh, I, I, the fact that he was physically present is, is not consequential because his role is the same, whether he's physically present, whether he's available by intercom, whether he's on speaker phone, his role, his, his only reason for being is to translate from one language to the other. The exact nature and the manner in which he does it is inconsequential because that's all he's doing. Well, now I have, uh, I gather from what you're saying that you concede that in the total picture there was, there was persecution. The issue is whether or not your client as an interpreter participated in that. That's correct, Your Honor. And you say mere presence is not enough. And we all know that's true even in the commission of crimes. But the major factor in this case that strikes me is the duration of his service. Now I have, is it correct he served for what, 12 years doing this? No, he was a police officer from 1982 until 1990. The, the, uh, time during which he interpreted was from 1982 or 83 approximately to 1988 or 89. So we're talking about what, six or seven years then? Yes, Your Honor. And is it, is it, do you concede that this type of persecution was going on during that entire span? I would concede that the Peruvian government uses interrogation as a technique to gain information from a terrorist organization. That's not the question. There, you, you concede that there was persecution going on in this setting? By the Peruvian government, yes. Now, how long did it go on? Do, does the record show us how long it went on? During? During his tenure as an interpreter. Well, concede, no it doesn't. The record does not state that. It was a substantial time though, was it not? Yes, he interpreted over a six to seven year period. And, uh, well, but the, I'm focused on how the duration of what is labeled as persecution. Do we know that? Was that, that was not a single incident. That was an ongoing pattern, was it not? Yes, he was, yes, he did interpret on numerous occasions. And during the time when he was an interpreter, and I take it that he was employed and paid a salary for what he was doing? By the, okay, he was paid his salary by the police, the police authorities. He was a police officer. He was not working for the government or the anti-terrorist branch or any other division. He's only a police officer who happened. The reason why he was called in was because he, he knew the language that they were. Yes, his grandparents came from the highlands of Ayacucho, so they spoke the language in his household when he was young, so he learned it. That was the only reason he was brought in from a different division of the Peruvian government. No other reason. He did not know anything about the nature, the scope, the extent. But he did over time. That's what Judge Levy, the point Judge Levy is making, that, that if this had happened once or twice, it wouldn't be one thing, but he certainly learned the scope over time. Yes, that's the, well, the, he learned that he was interpreting. I mean, he was not given, he was, he was given messages by phone or by anonymous letters stating to be at a certain place at a certain time to translate from Quechua to Spanish and vice versa. That's all the instructions he was given. Did the police department require that he do this? What if he'd said, I just want to be a policeman? First of all, there would have been two repercussions. First of all, he would have destroyed his career. Secondly, given the nature of the things that he was viewing, that the Peruvian authorities could inflict on another person, he was also in fear that that same thing could happen to him. So he did continue in his legitimate role. Now, Your Honor, there are police officers in our own police departments who speak English and Spanish. If, can they be found guilty of interrogation if they are merely acting as an interpreter while another police officer inflicts harm on someone because of their race or their religion? Perhaps. Perhaps is correct, but in this case, he did not participate. He was merely a mouthpiece. He was doing what a computer could have done, a computer with a voice recognition technology could have done, nothing else. Thank you. Okay. Your time is up. Thank you very much. I should say that I'm going to be fairly tough on time this morning because we have a very long calendar. Thank you. Thank you. Good morning, Your Honors. May it please the Court, and I'll ask Alicia Schwartz for Respondent John Ashcroft. There's no question that what happened in those rooms where he was called to interpret was persecution. Could I say something? I found your brief in this case entirely inadequate and very strange. You had basically one page. I beg your pardon? Your brief in this case was entirely inadequate. This is a set of law in which we have no law in the circuit, and there are at least conceptual questions that should have been addressed. There was nothing addressed in that brief. I will pass it along to my colleague who wrote it, Your Honor. There's nothing in it. I mean, you shouldn't write anything. There's a page. There's about one page, as I recall, of argument. But go ahead. Well, the statutory – well, there is no law on that. And the – what we have here is the facts. I disagree with counsel. The facts are clear that for six or seven years, he received anonymous notes in his mailbox or telephone call saying, come on in, we want you to translate. He went in, and each time he was called to interpret, many times in a closed room with sand, an electrical current was passed into their hands or feet. How many times did you see this? Every time I was called to interpret. Over six years, two or three times a month. And the reason he did not decline to do it was he thought it would, as he said, impair his career. He wouldn't get promoted. He might get a bad evaluation. He never said he feared that it would happen to him. Never said that. There – which might not even matter anyway, even if he had said it. But we have the very little guidance, as I say. We have the Federenko case, which is a strange dichotomy between cutting hair for people going into the concentration camp to be – and actually wielding a gun. And why does this – taking that as the dichotomy, why is this not on the hair side, I guess, is the question. Well, I find that example very strange to begin with, but there seems to be such a – We have a different set of regs and a different statutory section and a different burden of proof, Your Honor. In Federenko, that was the – But the burden of proof wouldn't matter for that purpose. That was a substantive statement. But it does matter in the sense that in Federenko, it was denaturalization. You were taking away a right and a privilege that had been bestowed. But how is the standard substantively different? I understand the burden of proof is very different, but that doesn't matter for this purpose. Because in this case, we are talking about a regulation which has shifted the burden to the alien who is applying for relief, and so it's his burden initially. But what is he trying to prove is the question. In other words, if the hair example is an example of somebody who is not assisting, it's still a substantive standard. The burden of proof doesn't matter. Then we get to the Chevron-Aguirre deference. We are now before the board and the immigration judge who are interpreting a statute that they are authorized to administer. That is when Chevron-Aguirre deference is at its highest. Did the BIA itself write anything in this case? No. Purely streamlined. Your position is that we owe Chevron deference to the IJ? Well, acting as the attorney general, yes, as the attorney general designate. In this case, yes. And what happened here was the immigration judge defined otherwise participated as what this person did, which is showing up for persecutory and torturous interrogations two or three times a month for six years. And never saying no. He may not have turned the knob, but it was a reason. Are you basically saying this may be like the hair example, but nonetheless you're taking an opposite, a different view? I mean, I would like some conceptual understanding of what the criteria are that distinguish assisting from non-assisting among the little guidance we have as a statement in Fedorenko. Okay. Well, Fedorenko is good for guidance as to what constitutes assistance or participation in. There is no question that he participated in the interrogations. The only question is, was this, does this meet the definition of otherwise participated in the persecution of others? Is it a reasonable reading of the statute to say, yes, showing up 150 to 200 times to watch people be tortured? And what about cutting hair 10,000 times, knowing that people were going into being incinerated? That would be a question for the board and the immigration judge. But the Supreme Court has given us an answer on that, a rather strange one, I should say, but it has made a statement about it. And that statement, it's a benign act. No way. So now we're getting someplace. So what's the difference? The difference is, okay, cutting the hair is a benign act. You are not participating in, well, furthering the act of persecution. Well, they were cutting the hair so they could use it in Germany for various purposes. That doesn't sound very benign to me. Your Honor, it doesn't sound benign to me, but that's what the Supreme Court said. But the point is that the hair was not used to harm anyone, probably to make wigs. That's a benign purpose. There was no persecutory motive in that act. It was purely cutting hair. Fedorenko, on the other hand, had a gun. He was an armed guard, and he had some authority, some control over the situation. That's why I wanted to get into this, because it's a useful analysis. This individual didn't have any control. He couldn't have stopped the torture, as I understand it. He didn't have a gun. He was, in some sense, necessary. He was necessary to the proceedings, but he had no control over it. Well, Your Honor, we don't know that. He says he didn't report it to anyone because he was afraid it would affect his promotion potential. He never went to the superiors to say, hey, listen, if you want answers out of these guys, you've got to turn down the volume. Because he testified that they turned the electricity up so high that the people were rendered unconscious or incoherent, and he could not perform his duties as a translator. And he said that at the interrogations, and he was told to be quiet, you're just a translator. But he never went to someone in a position of authority to say, listen, if you really want answers from these guys, you've got to turn down the electricity, because I'm not getting the answers. But I understand that the decision of the I.J. is based – that that wouldn't matter to the decision, that he was there, he was translating, he was present, he was necessary to the result. And whether he could or couldn't have had some impact on how much juice they used was really quite beside the point, as I understand the I.J.'s opinion. It is beside the point, first of all. And, again, the statute and the regs do not require any voluntariness, any duress. They don't consider that. It's purely a statutory interpretation, which the Attorney General's designates made, that his actions constituted otherwise participation. And that reading is sustained by the record that he actually did this, that he participated – well, again, voluntariness isn't an issue – but went back two or three times a month for six years to watch these people being tortured. That is assisted and participated. There is no – that is not a misreading of the statute, and that is what would have to be found in order for this Court to reverse that finding. Kennedy, is it a permissible reading of the statute to find that someone who shows up and watches people be tortured two or three times a month, that's not even part of his job? Yes, it is a permissible reading of the statute, and that is all that is required to uphold the statute. I should say that I'm somewhat dubious that an I.J.'s opinion, sitting by itself, gets Chevron deference. Well, Your Honor, it is the Attorney General who has the statutory authority to interpret this, Greg. His designate is the Board of Immigration Appeals. And we have no idea that the Board of Immigration Appeals has adopted this interpretation. Well, by the streamlining – yes, you're right, because the streamlining regulation does say that. So we have no idea that this is what the BIA thinks. So how can we – the BIA just says the result is correct. Well, then, again, it goes to the immigration judge, who is also the designate of the Attorney General, Your Honor. But I know you don't like that. I find it unlikely, frankly. But under the streamlining regs, because the BIA is not committing itself to that interpretation, but only to the result, we have no – we do not have the Attorney General committed to the interpretation. We only have the Attorney General committed to the result. However, the result is that he was found to be a persecutor, to have otherwise assisted, participated in the persecution. And it could be based on a different view of the record than the I.J. For example, it could be based on the view of the record that you articulated, i.e., that he could have stopped it had he tried. We have no idea what the BIA thought. We certainly don't know that the BIA was buying the I.J.'s view of the statute. Nevertheless, because, again, the – I know you don't like going down to the immigration judge level. However, the immigration judge in this capacity was acting as the designate of the Attorney General, and his interpretation is entitled to deference. Well, do we – is there any case law still holding after streamlining? No, actually, no. No, I don't think there is. Thank you, Your Honor. Thank you very much. Thank you to counsel. The case of Miranda Alvarado v. Ashcroft is submitted.  Thank you. Please reserve time if you want to reserve time.
judges: B. Fletcher, Leavy, Berzon